```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                             :
                                        Docket #1:22-cv-09409-
 CASSAVA SCIENCES, INC.,           : GHW-OTW

                    Plaintiff,     :

   - against -                     :

 BREDT et al,                      : New York, New York
                                     March 8, 2023
                    Defendant.     :
                                     INITIAL CASE
--------------------------------- : MANAGEMENT CONFERENCE


                    PROCEEDINGS BEFORE
                THE HONORABLE ONA T. WANG,
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          Benesch Friedlander Coplan & Aronoff
                        By:  Erik Connolly, Esq.
                             Timothy M. Frey, Esq.
                        71 S. Wacker Drive, Ste 16th Floor
                        Chicago, IL 60606


For Defendant,
Quintessential Capital
Management LLC:         Kleinberg, Kaplan, Wolff & Cohen, P.C.
                        By:  Joshua Kallman Bromberg, Esq.
                        500 Fifth Avenue
                        New York, NY 10110

                        Kleinberg, Kaplan, Wolff & Cohen, P.C.
                        By:  David M. Levy, Esq.
                        551 Fifth Avenue
                        New York, NY 10176


Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com
```

APPEARANCES - CONTINUED:

For Defendants, David
Bredt & Geoffrey Pitt:      Goodwin Procter LLP
                            By:  Meghan K. Spillane, Esq.
                            The New York Times Building
                            620 Eighth Avenue
                            New York, NY 10018


For Defendants, Jesse
Brodkin, Enea Milioris
and Adrian Heilbut:         Clarick Gueron Reisbaum LLP
                            By:  David R.S. Kumagai, Esq.
                            Isaac Berkman Zaur, Esq.
                            220 5th Avenue, 14th Floor
                            New York, NY 10019

                            Law Office of Daniel F. Wachtell
                            By:  Daniel F. Wachtell, Esq.
                            90 Broad Street, 23rd Floor
                            New York, NY 10004



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

```
 1                        PROCEEDINGS                    4
 2            THE CLERK:  This is 22-civil-9409, Cassava
 3   Sciences, Inc. v. Bredt et al, before the Honorable Ona T.
 4   Wang.
 5            Please state your appearances for the record.
 6            MR. ERIK CONNOLLY:  This is Erik Connolly and Tim
 7   Frey on behalf of Cassava Sciences.
 8            HONORABLE ONA T. WANG (THE COURT):  All right,
 9   good morning.
10            MR. JOSHUA KALLMAN BROMBERG:  Joshua Kallman
11   Bromberg of Kleinberg, Kaplan, Wolff & Cohen, P.C. on
12   behalf of defendant, Quintessential Capital Management LLC.
13   And I'm joined by my colleague, David Levy.
14            MS. MEGHAN K. SPILLANE:  Good morning, your Honor.
15   Meghan Spillane from Goodwin Procter on behalf of Dr. Bredt
16   and Dr. Pitt.
17            MR. DAVID ROBERT SHINE KUMAGAI:  Good morning, your
18   Honor.  David Robert Shine Kumagai on behalf of Jesse Brodkin
19   and Enea Milioris and Adrian Heilbut.  And with me is Isaac
20   Zaur and Dan Wachtell.
21            THE COURT:  Okay.  This is a little more
22   complicated than some of my typical Initial Case Management
23   Conferences.  So I understand, I think, plaintiff's claims.
24   But why don't I just get a brief overview.  And then with
25   defense counsel, everybody will get a chance to speak.  I
```

```
 1                          PROCEEDINGS                    5

 2   just want to understand who the defendants are and how they

 3   fit in with each other.

 4          The other thing I'm going to ask plaintiff's

 5   counsel to do is to talk to me a little bit about what the

 6   status is of any regulatory or criminal investigations, to

 7   the extent you know.

 8          MR. CONNOLLY:  Okay.  Thank you very --

 9          THE COURT:  And can disclose -- I'm sorry.

10          MR. CONNOLLY:  And can disclose.  Thank you very

11   much.  I appreciate that, your Honor.  So I will try to

12   describe the factual background but not in an aggressive or

13   colorful way.  The allegations here center around a company

14   called Cassava Sciences.  It's a biotechnology company, and

15   they are developing a drug they hope is successful in

16   treating Alzheimer's disease.  They have gone through a

17   series of tests already --

18          THE COURT:  And what's the -- I'm sorry -- I

19   should know this, because I've seen it, but I can't recall

20   the name of the drug off the top of my head.

21          MR. CONNOLLY:  Simufilam.

22          MR. TIMOTHY FREY:  Your Honor, it's  S-i-m-u-f-i-

23   l-a-m.

24          MR. CONNOLLY:  So they went through a series of

25   the mandatory testings and have now been approved by the
```

```
 1                        PROCEEDINGS                6
 2    FDA for what's called the third-phase testing, which is the
 3    last set of tests that you do before you go to market with
 4    the drug.
 5            What Cassava has alleged is that each of these
 6    group of defendants published defamatory information about
 7    them in order to make money from a decline in the company's
 8    equity price.  So each of the defendants are alleged to be
 9    short sellers of Cassava's equity.  And the way that the
10    short sellers can make money is if the equity price goes
11    down.  And so what Cassava has alleged against each group
12    is that at different times and in different publications
13    they each made some fraudulent statements about Cassava.
14            Cassava's perspective on it is that the statements
15    that they made were essentially defamation per se because
16    they were accusing the company of being a fraud and
17    fabricating data.  Fabrication of data is a crime,
18    particularly when it's associated with regulatory issues or
19    securities issues.  And so, from Cassava's perspective,
20    they think the case is a case of defamation per se against
21    each of the defendants for their publications for accusing
22    them of being a fraud and accusing them of committing a
23    crime of fabricating data.  That is the allegation.
24            The defendants have multiple publications that
25    they've done.  There are what we've called the citizens
```

```
 1                         PROCEEDINGS                    7
 2  petition defendants, which are Drs. Bredt and Pitt, who --
 3           THE COURT:  Okay, slow down.
 4           MR. CONNOLLY:  I apologize.  I apologize.
 5           THE COURT:  Drs. Bredt and Pitt.
 6           MR. CONNOLLY:  Correct.  They published what is
 7  alleged to be the defamatory material in what's called
 8  Citizen's Petitions to a regulatory body and then in some
 9  supplements to those, as well.  The other defendant, QCM,
10  Quintessential Capital Management, published the allegedly
11  defamatory materials in a report that they posted on their
12  website and then in some social media postings, as well.
13  There is a dispute over whether or not the company QCM is
14  accountable for the social media posts by their founder.
15  So that is a contested issue, but obviously, Cassava has
16  alleged that they are.
17           THE COURT:  And the founder is whom?
18           MR. CONNOLLY:  Grego, Mr. Grego.
19           THE COURT:  And he is or is not a defendant?
20           MR. CONNOLLY:  He is not a personal defendant.
21           THE COURT:  Okay.
22           MR. CONNOLLY:  And then the last group, which
23  we've called the dot-com defendants, is a collection of,
24  currently before the Court, three defendants that also
25  published a series of reports and a PowerPoint presentation
```

```
 1                        PROCEEDINGS                    8
 2  and social media post making similar accusations regarding
 3  Cassava being a fraud and Cassava fabricating data.
 4           So we have for each set of the defendants what I
 5  would call one main -- one or two main publications and
 6  then for some of the defendants we've got social media
 7  postings, as well, not for each of the defendants.
 8           I hope that wasn't too colored.  I felt like that
 9  was pretty neutral.
10           THE COURT:  Okay.  so then talk to me about the
11  regulatory and criminal investigations, then.
12           MR. CONNOLLY:  So what Cassava can say about that
13  is those investigations from Cassava's perspective were
14  triggered as a result of the defamatory statements made by
15  these defendants and that there is no basis to any of
16  those.  Nothing has been formally brought against them, and
17  so from Cassava's position, that will amount to nothing.
18  But then Cassava came under the scrutiny because of the
19  defamatory publications of these defendants.  I'm certain
20  the defendants disagree with that, but from the Cassava
21  perspective that is the origin story for those, as well.
22  But at this point I can tell you there has been nothing
23  formally announced.
24           THE COURT:  Okay, which or where were the
25  investigations, or is that something you can't disclose?
```

```
 1                        PROCEEDINGS                    9
 2              MR. CONNOLLY:  I cannot disclose any of that
 3   information.
 4              THE COURT:  And you cannot -- can you disclose if
 5   they're closed?
 6              MR. CONNOLLY:  I actually don't think I am allowed
 7   to say that one way or the other.  I believe with most
 8   investigations, until there's a formal announcement by the
 9   agency, I am prohibited from making any statement.  And
10   that would be a violation of Cassava's interactions with
11   any agency.
12              THE COURT:  Well, that seems like it might be an
13   important trigger point as far as proving truth or not, no?
14              MR. CONNOLLY:  No, not at all, actually.
15              THE COURT:  Would it be material to truth?
16              MR. CONNOLLY:  We don't think so at all.  The
17   investments will run the course that they are going to run.
18   Obviously, I have other clients that I deal with that are
19   investigated, and I have civil proceedings that continue.
20   The issue, what this case really comes down to is whether
21   or not Cassava is a fraud, as alleged by the defendants, or
22   did Cassava fabricate its data.  Those are historical
23   events.  Cassava can readily establish that neither of
24   those things are true.  And from Cassava's perspective with
25   that proof, falsity is established, and the focal point of
```

| 1 | PROCEEDINGS                                    10 |

2 the case becomes, as it does in most defamation cases,

3 actual malice, if I have to satisfy that standard, which I

4 don't concede I do.

5         THE COURT:  Okay.  I mean, I guess in reading

6 between the lines, and maybe anticipating what some of

7 defense counsel might say is well, there's been no formal

8 charges yet -- with "yet" being the operative word.  But,

9 be that as it may, I guess if the process hasn't run its

10 course, the process hasn't run its course, and we don't

11 know one way or the other, right?

12         MR. CONNOLLY:  You don't know one way or the

13 other, which --

14         THE COURT:  Okay.

15         MR. CONNOLLY:  -- is why Court's typically don't

16 look at the potential of I'll call "sister" investigations

17 as a factor of whether or not you can initiate your civil

18 litigation.  I get to start my civil litigation, I get --

19         THE COURT:  Oh, yes.

20         MR. CONNOLLY:  -- to start my discovery.  If that

21 happens, certainly -- and, certainly if something like that

22 happens, we could all be back here in a very different

23 posture.  But, at the same token, I with some certainty --

24 I'm not a defense attorney here -- but if those don't

25 result in any indictments or any filings, I doubt the

```
 1                          PROCEEDINGS                    11
 2   defendants are going to say, "But we'll stipulate to
 3   falsity, then, because it didn't run its course."  So --
 4            THE COURT:  Well, I wasn't sort of talking about
 5   merits in the end or of the, you know, of anything being
 6   necessarily dispositive of an element yet, with "yet" being
 7   the obvious word, with "yet" being actually a very
 8   important word.  I mean, when I was in private practice and
 9   often on the defense side but sometimes on the plaintiff's
10   side, if there were parallel proceedings -- I won't gender
11   them -- but if there were parallel proceedings, either
12   regulatory or criminal, we would sometimes be asked to put
13   the brakes on in the civil proceeding, so -- which, of
14   course, brings us to the motion to stay but which I will
15   put that to the side because I do want to hear from the
16   defendants, the defendant groups and, you know, to the
17   extent you can, talk to me about how this even came up,
18   meaning, you know, how were these statements made.  I'm
19   assuming or I would hope that, you know, what would come
20   out in discovery, if discovery were to proceed, would be
21   that, you know, the defendant had some reason other than or
22   had some indication or suggestion other than just making it
23   up in their heads to say what they said.  Like I said, I'm
24   not asking for major disclosures; but, again, to the extent
25   that some of this might be helpful, it might also be
```

2   helpful for me to understand the motion to stay and where

3   it falls and, you know, where the various factors fall.

4           So anybody can start.

5           MR. BROMBERG:  Good morning, your Honor.  Joshua

6   Bromberg again on behalf of Quintessential Capital

7   Management.  Without going too deeply into the merits,

8   which are I think set forth in our motion to dismiss, we

9   think this is a garden-variety SLAPP suit, and it's been

10  filed by Cassava as retaliation against the multitude of

11  different defendants for public statements made on the

12  subject of a topic of very important public interest,

13  namely the testing and the science behind this new

14  Alzheimer's drug.

15          Our position has been, again as stated in our

16  motion to dismiss, that these statements not only were

17  substantially true but they were opinions or otherwise not

18  defamatory.  They were not made with actual malice, as

19  Cassava is required to prove here, either under

20  longstanding First Amendment case law or under the New York

21  anti-SLAPP statute.  And, finally, none of the statements

22  made by the defendants can be shown to have caused any

23  damages to Cassava as a matter of law.  Those are the

24  defenses that are common, as I understand it, to all of the

25  defendants.  And there are various individualized defenses

 1

 2   that have also been asserted.

 3          I will hold off on explaining to your Honor why we

 4   think the discovery stay is appropriate unless --

 5          THE COURT:  Yes, why don't you hold off for now.

 6   So QCM on its own published -- let's see, published

 7   materials in a QCM-issued report on its website, and the

 8   founder also said some things in a social media post?

 9          MR. BROMBERG:  Correct, your Honor.  There was a

10   report published on QCM's website, and subsequently there

11   were a number of Twitter posts made by Gabriel Grego, who

12   is the principal of QCM.  The reason for these, of course,

13   we concede that our client is a short seller, but what was

14   not mentioned in the Complaint -- obviously, this is

15   outside the record and will eventually be -- will be

16   uncovered in discovery, if we get that far.  We don't think

17   that's appropriate, but Quintessential Capital Management

18   has a very long track record of uncovering corporate fraud

19   and has as virtually unblemished record in that regard.

20          THE COURT:  All right, next?

21          MS. SPILLANE:  Your Honor, as I stated previously,

22   I represent Dr. Bredt and Dr. Pitt, who are two

23   neuroscientists who submitted a series of publications

24   before the FDA.  Significantly, the first of their

25   Citizen's Petitions before the FDA, which included a 39-

```
 1                          PROCEEDINGS              14
 2   page Statement of Concern, was submitted on August 18th of
 3   2021.  They then submitted four subsequent times, on
 4   August 30th, on September 9th, on November 17th, and
 5   finally on December 8th.  They had enlisted a law firm to
 6   submit these Citizen's Petitions on their behalf.  In them,
 7   consistent with what you heard from my colleague, they
 8   evidenced anomalies in the data and apparent errors in the
 9   data that gave them serious concerns that it was possible
10   that the data had been manipulated.
11              As you will see from our motion, which is fully
12   submitted, everything they said in the reports is backed up
13   with publicly available data that they attached, much of
14   which was actually annexed to the Complaint itself.
15              And, significantly, your Honor, while the first
16   publication was on August 18th -- of course, the Complaint
17   was not filed until November 2nd of 2022, which was over a
18   year later, and the identities of Dr. Bredt and Dr. Pitt
19   were known as of November 17, 2021.  So not only was the
20   first publication of the Citizen's Petitions long before
21   the one-year statute of limitations, but the identity of
22   both doctors were known well before the filing.
23              So our motion to dismiss papers have been fully
24   submitted, and we echo many of the defenses that have
25   already been raised.  But one that is particular to my
```

```
 1                        PROCEEDINGS                 15

 2   clients is, of course, a statute of limitations defense

 3   based on the first-publication rule.

 4           THE COURT:  Okay.

 5           MR. KUMAGAI:  Your Honor, David Kumagai on behalf

 6   of the dot-com defendants, Brodkin, Milioris and Heilbut.

 7   So our motion to dismiss is going to be filed tomorrow and

 8   then fully briefed by May 5th.  And, broadly, there are

 9   many of the same arguments you heard from the other

10   defendants; but there are two general aspects of our

11   motion.  The first is that we're moving under Rule 12(b)(2)

12   for lack of personal jurisdiction over defendants Brodkin

13   and Milioris.  Both defendants are out of state; there's no

14   allegation either of them ever set foot in New York in

15   connection with these challenged statements.  And plaintiff

16   Cassava is also out of state; they're a Delaware company

17   based in Texas.  So that will be as to two of the dot-com

18   defendants, Brodkin and Milioris.

19           And then, second, we're moving under 12(b)(6) to

20   dismiss claims against all three of our clients, Brodkin,

21   Milioris and Heilbut.  And the arguments are broadly

22   consistent with the arguments from the other defendants.

23   And as you'll see in our motion, your Honor, we are

24   especially focused on the context of this case, which

25   really is under the case law important, critically
```

 1

 2   important to keep in mind when evaluating these allegedly

 3   defamatory statements.  So all of the challenged statements

 4   were made within this context of a very public, very

 5   intense scientific debate over Alzheimer's research

 6   generally and Cassava's drug Simufilam, in particular.  And

 7   it really is a novel area of scientific debate.  And the

 8   Second Circuit in the *Ony* case from 2013 has very strongly

 9   cautioned Courts against trying to referee these types of

10   debates involving novel scientific claims.

11           So we'll argue that the defamation claims fail for

12   three reasons.  First, Cassava cannot plead falsity.  And

13   really, to answer your earlier question, your Honor, about

14   what the impetus for these statements was, it's all based

15   on publicly available data, including -- from Cassava,

16   including the CEO admitting errors in the research, both

17   their clinical studies and underlying research papers.  And

18   those are the errors that defendants have all been calling

19   out in their statements and, you know, drawing the

20   conclusion and expressing the opinion that they are signs

21   of possible data manipulation.  There's also been seven

22   scientific journals retracting or correcting articles

23   published by Cassava's lead researcher for its drug, and

24   these are --

25           THE COURT:  Did you say several or seven?

```
 1                        PROCEEDINGS              17

 2              MR. KUMAGAI:  Seven.

 3              THE COURT:  Seven.  Okay, what journals were they?

 4              MR. KUMAGAI:  So the first one is Plus One.  The

 5   second is Alzheimer's Research in Therapy.  The third is

 6   Molecular Nerve Degeneration.  The fourth is Neuroscience.

 7   The fifth is The Journal of Neuroscience.  The sixth is

 8   Neurobiology of Aging.  And the seventh is Physiology and

 9   Behavior.  And we'll cite those in our motion to dismiss

10   tomorrow.

11              THE COURT:  Are they all peer-reviewed journals?

12              MR. KUMAGAI:  Your Honor, I believe so, but I

13   can't confirm.

14              THE COURT:  Okay.  Are there -- and this might be

15   a question for Cassava counsel, for plaintiff's counsel --

16   are there continuing to be statements or reports or

17   coverage of this drug and these issues along the lines

18   of -- I saw a mention in the 26(f) report that Cassava may

19   need to amend its Complaint?

20              MR. CONNOLLY:  This group of defendants, some of

21   these defendants, have continued to publish defendant

22   statements about Cassava since the filing of the Complaint.

23   So there is some ongoing defamation that has taken place

24   since the filing of the Complaint.  The Court will have to

25   evaluate the amendment of the Complaint to encompass those
```

```
 1                        PROCEEDINGS                18
 2   at a future date and time.  Typically the way that works
 3   for the defamation cases is if the new defamatory
 4   statements are of the same ilk, same nature as the existing
 5   ones.  You can amend it, and you can bring it back in at a
 6   subsequent date due to a lack of bias to the defendant.
 7   But that's the typical evaluation that we do.
 8             THE COURT:  Okay.  All right, and I see that there
 9   is at least one defendant who needs to be served in
10   Germany, still.
11             MR. CONNOLLY:  Yes.  So --
12             THE COURT:  Who's that defendant?
13             MR. CONNOLLY:  Mr. Markey.  Mr. Markey would be
14   part of the dot.com defendant group, or at least that's the
15   naming that we have used for convenience's sake.  His
16   counsel in good faith was, I believe, working to determine
17   whether or not they would accept service.  Once they
18   indicated to us that Mr. Markey would not be accepting
19   service through counsel, we initiated the proceedings to
20   serve it in the Hague.  The documentation is with Germany
21   now, and that will play out however that typically will
22   play out.  And I'm sure your Honor knows that that can take
23   anywhere from a few months to a long time.  And if I
24   ultimately have to amend my roster to address that, I'll
25   amend my roster to address that.  We'll see what happens
```

1

2    there.

3              THE COURT:  Okay, so what you're calling the

4    Citizen's Petition groups are scientists, are Ph.D.'s who

5    can and did apparently review the data, review the peer

6    review journals.  Are there any other scientist defendants

7    in the other two defendants groups, or are they investors?

8              MR. CONNOLLY:  Yes, your Honor.  The dot.com

9    defendants all have Ph.D.'s and are scientists, as well.

10             THE COURT:  And so Mr. Markey should actually be

11   Dr. Markey?

12             MR. CONNOLLY:  I apologize, yes.  I believe

13   Mr. Markey is a Dr. Markey.  I apologize.  Then, that

14   means --

15             THE COURT:  Yes, because, I mean, this case -- I

16   mean, one should say that in all circumstances, that

17   matters; but in this case, it definitely matters.

18             MR. CONNOLLY:  I absolutely respect that.

19   Cassava's allegations in that regard is their status as

20   doctors actually demonstrates the actual malice that we

21   would not necessarily have in other circumstances.  And so

22   I certainly apologize.  I did not mean --

23             THE COURT:  Wait, so I'm trying to understand why

24   if their status as Ph.D.'s would actually demonstrate

25   actual malice; I'm just trying to understand that.

```
 1                        PROCEEDINGS                    20

 2              MR. CONNOLLY:  There is a section in our Complaint

 3    that discusses common knowledge in the scientific

 4    community.  It is at page 135.  It begins at paragraph 316

 5    and continues through to paragraph 330.  And this is one of

 6    the -- I believe we have 50 or 60 paragraphs discussing the

 7    actual malice of these defendants.  One of the primary

 8    reasons why their status as doctors bolsters the claim for

 9    actual malice is because they had knowledge that what they

10    were calling anomalies or what they were calling

11    irregularities were not indicia of fraud and were not

12    indicia of fabrication.  There is a potential that if I

13    look at something with no scientific training whatsoever, I

14    could says that seems like maybe that's fraud.  But if

15    you're a doctor and you actually study it, you know it's

16    not.

17              And so one of the issues here is that that, in

18    conjunction with all the other evidence, indicates that,

19    well, you can say that something might be an anomaly; what

20    the Court's don't let you do and what is an entirely

21    different nature of defamation is claiming that something

22    is a fraud or fabricated.  There's a clear demarcation in

23    the law on those two things.  And from Cassava's

24    perspective, the reason they brought the case, is that it

25    crossed that line.
```

PROCEEDINGS                 21

 2              THE COURT:  So, I mean, the law may have a clear

 3   demarcation, but my concern would be whether -- and, you

 4   know, I'm just speaking -- you know, I have not done a deep

 5   dive into this, I've not done a deep dive into the law, for

 6   sure; but is it possible that there's something in between

 7   fabrication and fraud and perfectly fine data that just has

 8   anomalies that could be what, when I was a scientist, would

 9   have called sloppy science, right, that there is -- you

10   know, the controls that are in place -- and I don't mean

11   just your control group -- but controls and guardrails

12   around the research and the procedures that are in place

13   are not -- that they could be indicative that those actual

14   procedures weren't always followed.  And that could be --

15   to use a discovery and spoliation analogy, it could be one

16   of those things where it's like somebody didn't destroy the

17   documents intentionally, I mean, the act was intentional

18   that they were destroyed but it was just inattention,

19   negligence, failure -- lack of care around a certain set of

20   procedures.  I'm not saying that that happened with

21   Cassava; I'm just saying that this -- you know, I'm -- I

22   question -- and I guess it might come down to what the

23   actual anomalies are -- whether certain defendants having a

24   deeper background and a scientific background actually cuts

25   one way or the other.

```
 1                        PROCEEDINGS                 22

 2             MR. CONNOLLY:  Sure.  And I would give three

 3   responses to that, if you allow me --

 4             THE COURT:  Yes, go ahead.

 5             MR. CONNOLLY:  -- and I'll keep it brief,

 6   obviously.  The first is what is alleged in the Complaint

 7   does not fall into the category of the gray area, as you

 8   have described it.  Cassava alleges in the Complaint, in

 9   pretty excruciating detail, that that is not the case here,

10   and it's all factual allegations.  The second thing I would

11   say is the gray area that you were discussing, that concept

12   absolutely would end up, I expect, to be one of the hotly

13   contested disputed issues of fact between the parties that,

14   until we complete discovery -- and ultimately, the trier of

15   fact would have to make a call on that -- but I do think

16   you are correct in identifying something that once we get

17   into the facts and we're not looking at the allegations,

18   that's going to be hotly contested by the parties.

19             THE COURT:  All right.

20             MR. CONNOLLY:  And, briefly, your Honor, I'll just

21   make one other reference.  I know some journal articles

22   were cited by the dot.com defendants.  I would direct the

23   Court's attention to paragraph 30 of the Complaint, which

24   are the journal articles that at one point may have

25   partially retracted and then flipped and said no, we see no
```

PROCEEDINGS                        23

1

2   evidence of fraud here.  And those are listed out in

3   paragraph 30 of the Complaint for you -- I'm sorry-- 300,

4   paragraph 300 -- too many zeros.

5          THE COURT:  What a difference a zero makes.

6          MR. CONNOLLY:  I know, I know.  I don't know the

7   last time I had a Complaint that wasn't over 100 pages.  So

8   this is --

9          THE COURT:  I'll tell you that when we first --

10  when I was in private practice, I spent a lot of time

11  working with the Madoff trustee in asset recovery.  And

12  when we were trying to figure out what various customers'

13  purported losses were, I would read them and by like, "Oh,

14  wow, they claim they lost $5 million -- oh, no, wait, I

15  missed three zeros, I miscounted the commas and zeros."

16         So, let's look at the motion to stay.  I don't

17  really want to have full-blown argument -- oh, actually,

18  before I do this -- I might have missed this in the Case

19  Management Plan -- have you exchanged your initial

20  disclosures yet?  Yes.

21         MR. CONNOLLY:  We did, we did.

22         THE COURT:  All right.  In light of all the other

23  things going on in this case, my leaning had been and has

24  been, continues to be to stay discovery for a period of

25  time.  But I am willing to hear you out on why you think

```
 1                        PROCEEDINGS                24
 2  that's not a good idea.
 3           MR. CONNOLLY:  Thank you, your Honor.  I think I
 4  would focus here on burden, and I'd focus on prejudice,
 5  because I think the initial disclosures, which I'm happy to
 6  give your Honor copies of the --
 7           THE COURT:  No, I don't want to see them.
 8           MR. CONNOLLY:  But the -- I know you want more
 9  paperwork.
10           THE COURT:  No, I don't.
11           MR. CONNOLLY:  The initial disclosures demonstrate
12  that there's actually no burden here and that the prejudice
13  would be significant.  So on burden, which is obviously the
14  defendant's need to establish that the discovery is going
15  to be oppressive and burdensome to them, we have not
16  exchanged any interrogatories or requests for production,
17  so none of that is out the door yet.  And so no one can
18  actually say it's going to be burdensome.  And the one data
19  point we do have on burden has to do with the
20  identification that the parties have made of individuals
21  with knowledge because those will be the custodians from
22  whom this group of defendants would have to gather
23  documents.  Drs. Bredt and Pitt have only identified two
24  people with relevant knowledge, themselves, in terms of
25  things that they would have to collect documents from.  QCM
```

```
 1                          PROCEEDINGS                    25

 2   has identified one person, their principal, as the only

 3   person with relevant knowledge; and so, therefore, you're

 4   talking about collecting documents from one person.  The

 5   dot.com defendants didn't identify themselves at all as

 6   having release knowledge, but I'm going to assume that they

 7   do.  And so that's three people.

 8             THE COURT:  Okay.  Let me stop you right there.

 9             MR. CONNOLLY:  Yes.

10             THE COURT:  I was actually thinking more about

11   Cassava's witnesses.  If there are parallel proceedings

12   which cannot be disclosed, why are we not -- why would we

13   end up in -- why would we put defendants through having to

14   either seek documents or depositions or other disclosures?

15   What do you do with a document request that says produce

16   everything that has been provided to a regulatory or

17   investigative agency; identify every single meeting you

18   have had with any regulatory or investigative or criminal

19   agency; let's depose somebody and have them take the Fifth

20   multiple times until something is closed; why do we want to

21   do that?

22             MR. CONNOLLY:  First, you're presupposing

23   something that is not accurate.  I have not asserted the

24   Fifth Amendment.  And so you're claiming that my clients

25   are --
```

 1
 2          THE COURT:  I know.  But what I am saying -- I am
 3  telling you this from my experience, both managing cases
 4  that have parallel proceedings for the last several years,
 5  as well as in my experience as a private practitioner
 6  working at the intersection of bankruptcy, criminal, SEC
 7  and civil proceedings.  So I am asking you how do you
 8  respond to that, if your client gets document responses,
 9  requests for deposition, interrogatories that seek that
10  information, the same information that you just said
11  earlier you are not at liberty to disclose?
12          MR. CONNOLLY:  So there is a fine distinction
13  there, your Honor.  So if you're asking me for the
14  documents that have been provided to regulatory
15  authorities, I absolutely can provide that information.
16  That's going to be part of my document production already.
17  If you're asking me for things that went to a DOJ, I'm
18  absolutely giving you that already because I'm providing
19  it, anyways, as part of my regular production.  So the
20  only -- I'm trying to think if there's any category of
21  document request that I'm going to get hit with that I
22  would have to assert anything that would prevent it from
23  being disclosed.  And I can't think of in this context
24  anything.
25          And if there's concern about the regulatory

1

2  proceedings and the status of it are so gave, then I am

3  happy to go back to my client and I'm happy to go back to

4  the attorneys who are handling that directly to find out if

5  I can give you a better update with respect to it.  But

6  right now, sitting here, I see no reason why I'm holding

7  back anything from my production based upon those parallel

8  proceedings.  I just don't see it.  And so it's speculative

9  that I might have it.  And if we have to wrestle with it

10 and there is of 25 RFPs one that I have to go back and

11 discuss with the Court, well, that's the exact same thing

12 we do whenever we have an RFP that might have some

13 disagreement over an attorney-client privilege assertion of

14 it.

15         So I am not going to be holding back on

16 proceeding with the discovery.  My client needs to get

17 discovery going, and they need to get it going fast because

18 the one thing that we learned from the 26(a) disclosures is

19 that the majority of the information or a very significant

20 portion of the information that is critical to this case is

21 in the hands of third parties.  QCM identified nine third

22 parties they said had relevant information.  The dot.com

23 defendants identified 40 third parties that they said had

24 relevant information.  I need to start issuing subpoenas to

25 those third parties.  I need to get discovery requests out

```
 1                            PROCEEDINGS                  28

 2   to them because they're under no preservation obligations

 3   at all.  Indeed, I need interrogatories because I don't

 4   even know all the third parties that are at play right now.

 5   QCM in their report said that they relied upon a group of

 6   unnamed scientists.  But when I read their 26(a)(1)

 7   disclosure, they're not there.  So now there are some

 8   unnamed scientists that I still need to figure out who they

 9   are.  So delay from my end risks losing discovery from the

10   third parties that all the parties in their 26(a)(1)s said

11   were highly relevant.  And there's no reason to do that

12   because I can't satisfy their burden element.  They've got

13   six custodians.  I have far more that I have to deal with.

14   I am taking on a bigger burden.  They have six custodians.

15   That's it.  That's not burdensome under any measure.

16             MR. BROMBERG:  Can I be heard on that, your Honor?

17             THE COURT:  Yes.  I would love for you to be heard

18   on that.

19             MR. BROMBERG:  So I'm not sure how Mr. Connolly

20   can say that discovery will not be burdensome here because

21   discovery will need to be taken not only from the six

22   defendants who are before your Honor today but from the

23   plaintiff, as to whom we expect there will be at least six,

24   probably twice as many employees who need to be deposed,

25   putting aside all of the document productions.  And then,
```

```
 1                            PROCEEDINGS                   29
 2   as Mr. Connolly mentioned, there are literally dozens of
 3   third parties as to whom just documents will need to be
 4   taken and discovery -- depositions will need to be taken.
 5   And, in addition to all that, your Honor, there's
 6   Dr. Markey, who still hasn't been served.  And then not
 7   only will there be the usual burdensome discovery of
 8   electronically stored information, but all of this
 9   information pertains to the subject matter of very complex
10   scientific studies and academic papers, which can only
11   vastly elevate the costs and burden of discovery, which
12   include, of course, expert discovery, should that become
13   necessary.
14           So that's what I have to say as to burden.  Now,
15   as to the regulatory proceedings, first of all, as your
16   Honor noted, those regulatory proceedings are still
17   ongoing.  As my able co-counsel has informed me, only on
18   the 28th of February Cassava filed its report stating that
19   those proceedings are ongoing.  I've also been informed by
20   my co-counsel that the plaintiffs in the securities class
21   action ongoing in the Western District of Texas requested
22   documents from Cassava pertaining to the ongoing regulatory
23   and criminal proceedings, and Cassava opposed that request.
24   We would, of course, fully expect to make similar requests
25   to Cassava.  To the extent that those regulatory and
```

```
 1                           PROCEEDINGS                    30
 2   criminal proceedings are still ongoing, it's not clear that
 3   we'd be able to obtain the information that we're seeking
 4   at this juncture, which --
 5              THE COURT:  Let me just stop you right there.  You
 6   said there's plaintiffs in a securities class action in the
 7   Eastern District of Texas who sought documents, and Cassava
 8   opposed those requests.  They opposed them on the basis
 9   that there were ongoing parallel proceedings or for some
10   other reason?
11              MR. BROMBERG:  It's a Private Securities
12   Litigation Reform Act, PSLRA automatically stays discovery
13   in securities fraud cases until an MTD is decided, the
14   motion to dismiss is decided.
15              MR. CONNOLLY:  Can I speak to that, your Honor?
16              THE COURT:  Yes.
17              MR. CONNOLLY:  So --
18              THE COURT:  Are you -- do you represent Cassava in
19   the securities litigation?
20              MR. CONNOLLY:  No, I do not, your Honor.
21              THE COURT:  Okay, let's hear from Mr. Bromberg,
22   then.
23              MR. BROMBERG:  The Court can take judicial notice
24   of Cassava's conduct in that securities class action.  It's
25   in the Western District of Texas.  And contrary to the
```

```
 1                         PROCEEDINGS                  31
 2    position they're taking here, Cassava opposed the
 3    plaintiffs' motion for partial relief from the PSLRA
 4    discovery stay.  And I'll quote from their brief.  They
 5    say, "Here, plaintiffs have failed to show they will be
 6    unduly prejudiced by having to wait just a few more months
 7    to obtain the discovery at issue.  After all, it is not as
 8    though they will be obstructed from obtaining the discovery
 9    forever, because the stay is temporary and lasts only
10    unless and until plaintiffs' Complaint survives the motion
11    to dismiss stage, when they will have access to all of the
12    discovery material they seek."  That's 21-cv-751-DAA,
13    Western District of Texas, October 25th.
14              THE COURT:  21-cv-751?
15              MR. BROMBERG:  751-DAA, correct, your Honor.  And
16    that's Docket 82.  And based on that argument, the Court in
17    the Western District of Texas maintained the PSLRA
18    discovery stay, and we believe the same result should
19    obtain here.  The Court should exercise its discretion to
20    impose a stay until such time as the motions to dismiss
21    have been adjudicated.
22              THE COURT:  All right, let me hear again,
23    Mr. Connolly, about -- or Mr. Frey about the third parties
24    because if there is anything that I would be concerned
25    about if there's a stay entered, I would be concerned about
```

```
 1                          PROCEEDINGS                    32

 2   preservation by potential third parties, preservation

 3   issues.

 4           MR. CONNOLLY:  I think there's two ways to

 5   approach that, your Honor.  I completely understand my

 6   friend's argument regarding the concern about depositions

 7   and the costs associated with the depositions  If the Court

 8   wants to stay depositions, I would be amenable to that so

 9   that we could focus on the documents --

10           THE COURT:  Mr. Connolly, you're not answering my

11   question.  My question was --

12           MR. CONNOLLY:  And this is where I was going --

13           THE COURT:  -- preservation issues with third

14   parties who may not be on notice of this lawsuit and a duty

15   to preserve.

16           MR. CONNOLLY:  So I need to be able to serve

17   subpoenas to those third parties because that does start to

18   trigger the obligation to preserve.

19           THE COURT:  I know.

20           MR. CONNOLLY:  And I do need at least some

21   discovery --

22           THE COURT:  Who are these third parties, and --

23   you don't have to identify them, but you have to explain to

24   me why these third parties matter and why these third

25   parties might not yet be on notice.  I understand, I fully
```

PROCEEDINGS                    33

1

2  get it, that a subpoena is for damn sure the start date,

3  but that doesn't mean that they are not already on notice

4  and could be, could have a duty to preserve already.  So

5  I'm trying to parse that out, okay?

6           MR. CONNOLLY:  Sure.  The third parties are the

7  third parties that these defendants identified in their

8  Rule 26(a)(1) disclosure statements.  These defendants --

9  I'll use the dot.com defendants as my example -- identified

10 40 third parties that they claimed had relevant knowledge.

11 They range from scientific journals to scientists to

12 individuals who have done some testing on our drug to other

13 individuals that they may or may not have been relying on

14 for their statements.  And so when I think through the

15 third parties, there is a significant segment of them that

16 are being identified by these defendants in their Rule

17 26(a)(1) disclosures as individuals that they are telling

18 us have relevant knowledge.

19           THE COURT:  Isn't that on them, then?

20           MR. CONNOLLY:  No.  I need that discovery because

21 they might be using that to support their actual malice.

22           THE COURT:  Right.  But if they're going to use

23 it to support their actual malice, then the documents exist

24 and are preserved.

25           MR. CONNOLLY:  Not -- no.  If these third parties

```
 1                         PROCEEDINGS                    34

 2   had oral communications with any of these witnesses and

 3   these third parties have their own documents discussing

 4   what they did or did not know, I have to have that

 5   information.  If you are relying on a third party as a

 6   source --

 7             THE COURT:  Doesn't it only matter what the third

 8   party told or provided to the defendants, which the

 9   defendants presumably would have?

10             MR. CONNOLLY:  No.  Because the credibility of the

11   third party is the quintessential analysis of actual

12   malice.  If the third party is not a reliable source which

13   I can establish with information in the possession of the

14   third party, then you cannot rely on them for actual malice

15   purposes.  And in fact, what the case law says is your

16   reliance upon them undermines your credibility.

17             THE COURT:  Let me hear from the defendants who

18   listed these third parties in their disclosures.

19             MR. KUMAGAI:  Your Honor, Dave Kumagai for the

20   dot.com defendants.  So we don't understand Cassava's

21   concern here.  We actually understand that they've already

22   served preservation notices on third parties that they

23   believe to have relevant information, and so these are

24   people that we think may have relevant information in

25   support of our defenses.  As Cassava's counsel noted,
```

```
 1                        PROCEEDINGS                    35
 2   they're scientists and --
 3            THE COURT:  Wait, wait, wait.  Preservation
 4   notices have already been served by you?
 5            MR. CONNOLLY:  No, your Honor.  We sent to the 19
 6   third parties that we listed, we told them we have a
 7   lawsuit pending --
 8            THE COURT:  Okay.  What about the third parties
 9   disclosed by defendants?
10            MR. CONNOLLY:  I have not sent anything to them
11   yet.  Again, my letter doesn't have any binding authority,
12   of course, but I have not sent it to them yet.
13            THE COURT:  Let me decide whether that has any
14   binding authority.
15            Let me hear from Mr. Kumagai.  I mean, are the
16   third parties on your initial disclosures, are they
17   preserving documents?  I mean, I don't understand.  You're
18   saying that third parties on your initial disclosures have
19   already gotten preservation notices?
20            MR. KUMAGAI:  Not from us, your Honor.  We
21   understand from our clients that some third-party notices
22   have gone out.  But we haven't sent notices yet to these
23   individuals.
24            THE COURT:  Okay.  You know what, first ruling of
25   the day.  You're going to meet and confer and you're going
```

```
 1                        PROCEEDINGS                    36
 2  to figure out which third parties should get preservation
 3  notices and who's going to send them, and you're going to
 4  send them.  Okay?  This is for everybody.  This is not just
 5  for plaintiffs, this is just for defendants.  Okay, you're
 6  going to figure this out.  But I don't see this as a reason
 7  to have everybody engaging in wholesale discovery.  All
 8  right?
 9            Was there anything, Mr. Connolly, or Mr. Frey,
10  that you didn't get to say about the discovery stay
11  otherwise that you would like to say?  I'm not -- I told
12  you where I'm leaning.  I'm not going to rule except to
13  temporarily stay any other discovery other than the meet
14  and confer on the preservation notices until I actually
15  issue a written order.  Okay?  I'm going to need to take
16  some time to think about this.  I'm going to need to see
17  the transcript.
18            MR. CONNOLLY:  Nothing further, your Honor.
19            THE COURT:  Okay.  Anything further that the
20  defendants would like to add that's not in their papers or
21  that's come up today that you would like to respond to?
22            MR. BROMBERG:  Not from Quintessential, your
23  Honor.
24            MS. SPILLANE:  No, your Honor.
25            MR. KUMAGAI:  No, your Honor.
```

```
 1                          PROCEEDINGS                    37
 2              THE COURT:  All right, then, I am -- let me see if
 3   the dates -- I'll enter a discovery end date for now, just
 4   so that the docket system and all our internal systems
 5   don't have a big headache about the discovery end date.
 6   But because discovery is currently stayed for a short time
 7   until I formally rule on the discovery stay -- and I've
 8   already told you where I'm leaning -- that will probably
 9   get pushed and will get extended, depending on when the
10   motion to dismiss is decided and how it's decided.  Okay?
11   So I understand it's December of 2023, so let's not worry
12   about it right now.
13              Right now you are directed to meet and confer on
14   preservation notices that need to go out to third parties,
15   figure out all the third parties who need to get
16   preservation notices, make sure they go out.  Okay?  Work
17   together on that.
18              And then I think, because the motion to dismiss is
19   pending, the burden is on me -- usually I don't let you go
20   without another deadline that you have to follow -- but
21   since I have all the homework now, I think I just have to
22   go and do my homework.  So can you resolve the third-party
23   preservation notices in the next two weeks and then just
24   file a joint status letter saying that you've resolved it?
25   Or, if you need more time, explain to me why you need more
```

```
 1                          PROCEEDINGS                    38
 2   time.
 3            And then if there is a final resolution that can
 4   be disclosed of any of the regulatory or criminal
 5   proceedings, don't assume I'm going to see it.  Okay?  I'll
 6   put that on plaintiff's counsel to file a letter letting me
 7   know if something has changed there.  Okay?  Otherwise,
 8   silence will mean you can't say anything one way or the
 9   other until you can.  Okay?  Because I think that might
10   also be helpful in understanding the motion to stay.  I
11   mean, I don't think it will take that long; but in the
12   event something happens next week, for example, that would
13   be helpful.
14            MR. CONNOLLY:  Sure.
15            THE COURT:  Okay.  Yes?
16            MR. KUMAGAI:  Your Honor, sorry.  Just to correct
17   one minor point, I believe plaintiff's counsel mentioned
18   that we had been retained to represent the defendant
19   Markey, who has not been served yet.  We did have
20   discussions with him early on, but we have not been
21   formally retained.  So I just wanted to correct that point.
22            THE COURT:  All right, so Dr. Markey is currently
23   (indiscernible).
24            Okay, All right, anything else we need to do at
25   this time?
```

```
 1                        PROCEEDINGS                 39

 2            MR. CONNOLLY:  Not from the plaintiffs, your

 3  Honor.

 4            THE COURT:  Okay.  Defendants?  Any

 5            MR. BROMBERG:  No, your Honor.

 6            THE COURT:  All right -- oh, you know, one last

 7  thing, Case Management Plan, you had said you will discuss

 8  the possibility of settlement at the Rule 26(f) meet-and-

 9  confer.  Is there anything you would like to talk about

10  settlement-wise, either on the record, meaning you've

11  decided and you want to do mediation or you might want to

12  do something private or you're not ready; or is there

13  anything you would like to discuss off the record, which I

14  can also do?

15            MR. CONNOLLY:  Not from the plaintiff's side?

16            MS. SPILLANE:  No, your Honor.

17            THE COURT:  Okay, anything off the record?  Okay,

18  we're going to close the record.  I'm going to request the

19  parties order a copy of the transcript.  I understand there

20  to be three groups of defendants, so I'm going to ask you

21  to split the costs four ways.  Okay?

22            All right.  Thank you very much.

23            (Whereupon, the matter is recessed.)

24

25
```

40

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of Cassava Sciences,

Inc. v. Bredt et al, Docket #22-cv-09409-GHW-OTW, was

prepared using digital transcription software and is a true

and accurate record of the proceedings.


        Signature /s/Carole Ludwig

                Carole Ludwig


        Date:    March 13, 2023