UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
CASSAVA SCIENCES, INC.,

                Plaintiff,

                -against-

QUINTESSENTIAL CAPITAL MANAGEMENT LLC, et al.,

                Defendants.
------------------------------------------------------------x

22-CV-9409 (GHW) (OTW)

**REPORT & RECOMMENDATION TO THE HONORABLE GREGORY H. WOODS**

**ONA T. WANG**, United States Magistrate Judge:

**I.    INTRODUCTION**

This is a defamation and civil conspiracy case brought by Cassava Sciences, Inc. ("Cassava" or "Plaintiff") against three groups[1] of short sellers of Cassava stock, who allegedly profited from their investments by publishing (and republishing) allegedly defamatory statements about Cassava's development of simufilam, a drug intended to treat Alzheimer's disease. All three groups of defendants have moved to dismiss the First Amended Complaint ("FAC") (ECF 30). This third and final Report and Recommendation addresses the motion to dismiss[2] filed by Defendant Quintessential Capital Management LLC ("QCM" or "Defendant") (*See* ECF 77). For the reasons below, I respectfully recommend that Defendant's motion be **GRANTED**.

---

[1] The three groups are (1) the "Neuroscientist Defendants" David Bredt, M.D., Ph.D., and Geoffrey Pitt M.D., Ph.D. (*see* ECF 74; *see* ECF 104, Neuroscientists' R&R); (2) Quintessential Capital Management LLC (*see* ECF Nos. 77 and 78); and (3) the "Dot.Com Defendants" Adrian Heilbut, Jesse Brodkin, and Enea Milioris (*see* ECF 86; *see* ECF 105, Dot.Com Defendants' R&R).
[2] The briefing on QCM's motion to dismiss is located at ECF Nos. 78, 79, 88, and 92.

## II. FACTUAL BACKGROUND

The Court assumes familiarity with the basic science, factual background and analysis in my prior Reports and Recommendations recommending dismissal of the claims against the Neuroscientist and Dot.Com Defendants. (ECF Nos. 104, the "Neuroscientists' R&R" and 105, the "Dot.Com Defendants' R&R"). QCM's allegedly defamatory statements consist of a report published on November 3, 2021 (the "QCM Report") and Twitter/X posts by QCM and its sole member, Gabriele Grego. (*See* ECF 30-10; FAC ¶ 16-17; ECF 30-2, Appendix A).

### A. QCM Statements

Cassava asserts that QCM either directly, or through its sole owner Mr. Grego, made defamatory statements in the form of the November 2021 QCM Report, and then in several social media posts. (FAC ¶ 16-17; ECF 30-2, Appendix A). Like the Neuroscientist and Dot.Com Defendants, QCM disclosed its position as a short seller. (ECF 30-10 at 3).

#### i. *The QCM Report*

The QCM Report, entitled "Cassava Sciences (SAVA): Game over! A warning for the US healthcare system," begins with a disclaimer page that not only identifies QCM's short position in bold red type, but explicitly cautions that the report "reflects the opinions and projections of [QCM] . . . which is subject to change without notice at any time following the date of issue." (ECF 30-10 at 2-3).[3]

---

[3] This disclaimer further cautions: "While the information presented in this report is believed to be reliable, no representation or warranty is made concerning the accuracy of any data presented in this report or its attachments. All information provided in this report is for informational purposes only and should not be deemed as investment advice or a recommendation to purchase or sell any specific security." *Id*. at 3.

2

Unlike the Neuroscientist and Dot.Com Defendants, however, QCM spends relatively little time on the basic and foundational science beyond claiming that simufilam "appears **based on allegedly forged scientific research**," and "'**cherry picking**' of patients and statistical **manipulation of data**, of which we have plenty of disturbing evidence." *Id*. at 4 (emphases in original). QCM, a New York hedge fund (FAC ¶ 16), claims that its main activity "consists in identifying, investigating and exposing fraud and criminal conduct in public companies around the world." (ECF 30-10 at 6). The QCM Report then identifies several of its successful "short activist campaigns." *Id*.

Although QCM references the Citizen Petition and calls it "highly credible," the QCM Report then states, "we suspect that *the entire clinical research process might have been tainted by deception and misconduct*," and so they "proceeded with the goals of probing the legitimacy of the clinical trials, studying management's incentives, and understanding the nature of the actors involved." *Id*. at 7-8 (emphasis in original). I will summarize each of these categories of statements in turn.

    a. <u>Management Incentives</u>

The QCM Report begins by identifying market conditions in the field of Alzheimer's treatments that might lead to incentives for companies to overstate the efficacy of their putative treatment. *Id*. at 8. Few, if any, treatments currently exist for this terrible, terminal disease, incentivizing regulators to "be more lenient" with new treatments, "even those with doubtful efficacy." *Id*. As specific to Cassava, however, QCM notes that Cassava's bonus structure

3

pays bonuses once thresholds of market capitalization (beginning at $200m)[4] have been met and held for 20 days, leading to an incentive for management to keep Cassava's stock price high in the short term, potentially with less regard to shareholder value. *Id*. at 9 ("Should the drug then fail to deliver, and we think it will, shareholders will be wiped out, but management will get to keep their large bonuses.").

b.   <u>Statements Regarding Cassava Personnel</u>

In addition to describing the bonus structure and incentives for Cassava personnel (and noting that at the time, Cassava had a market capitalization of $2bn), the QCM report takes on the personnel themselves, noting that Cassava's CEO, Remy Barbier, is married to Lindsay Burns, SVP, who was Dr. Wang's coauthor on many of the scientific papers challenged by the other defendants. *Id*. at 7. Dr. Nadav Friedmann, then-Chief Medical Officer,[5] had previously been sued for securities fraud in connection with Remoxy,[6] "a pain killer that ultimately failed to gain FDA approval." *Id*.

The QCM Report saves its worst ire for "Hilda," Cassava's "Clinical Research Associate (CRA) or monitor." *Id*. at 10. Citing to Wikipedia, QCM explains that a CRA "ensures compliance with the clinical trial protocol, checks clinical site activities, . . . and make[s] certain that the scientific integrity of the data collected is protected and verified[, and] ensure[s] that adverse

---

[4] *Id*. at 9 ("Bonuses range from $10m to $50m <u>per threshold</u> and the thresholds range from $200m to $5bn. Intermediate amounts, unsurprisingly have not been disclosed, but we estimate the **total bonus pool to be around $450m**. Clearly management would get rich temporarily inflating Cassava's stock price by creating unlikely expectations for the prospect of its only drug, Simufilam.") (emphases in original).

[5] The hyperlink in the QCM Report at Dr. Friedmann's name now links to a Bloomberg.com page that identifies Dr. Friedmann as "deceased." *See* Bloomberg Profile, Dr. Nadav Friedmann, https://www.bloomberg.com/profile/person/1654181; *id*. at 7.

[6] The QCM Report asserts that Cassava was previously known as "Pain Therapeutics" until 2019, and that "[i]ts only asset then was Remoxy." *Id*. at 7.

events are correctly documented and reported." *Id*. at 11 (cleaned up). The QCM Report points to Hilda's criminal records in Texas reflecting possible felony and misdemeanor convictions, a "heavily plagiarized" resume, and a LinkedIn profile[7] connecting Hilda to the CRA position at Cassava. *Id*. at 11-12.

### c. Statements Regarding IMIC Personnel and Clinical Trials

The QCM Report then turns to IMIC Inc. ("IMIC"), a clinical research center in Palmetto, Florida, which is identified as the location of two authors (Evelyn Lopez-Brignoni and Boris Nikolov) on the 2020 *Journal of Prevention of Alzheimer's Disease* paper. (ECF 30-10 at 13, hyperlinks to paper).[8] It first suggests that IMIC, owned by Aimee Cabo and Boris Nikolov, has conducted no clinical research other than the simufilam clinical trials. *Id*. at 13. The report challenges Ms. Cabo's veracity and reliability on several fronts. Most relevant to this analysis, Ms. Cabo "claims to be a nurse, yet a record check at the Florida Department of Health has failed to show any license." *Id*. at 14. The report then paraphrases from an autobiography and news articles, all linked and referenced in the report, to identify her criminal history and other events and interactions with the criminal justice system in Ms. Cabo's past to further comment on her reliability and credibility. *Id*. at 14-15.

Dr. Nikolov, Ms. Cabo's husband, has a medical license in his native Bulgaria but not, apparently, in the United States. *Id*. at 18. In 2012, Dr. Nikolov filed a Chapter 13 bankruptcy

---

[7] The QCM Report also notes QCM's inability to confirm Hilda's reported educational background, but suggests that the LinkedIn profile is reliable because Hilda's profile is connected with multiple employees at one of simufilam's clinical sites. *Id*. at n.9, 12.

[8] This is the paper that was accepted for publication six days after it was submitted, and which provided the results of Cassava's Stage 2b "re-do" by Dr. Wang after another lab had apparently found no effect of simufilam on biomarkers associated with Alzheimer's disease. (*See* ECF Nos. 30-5 at 15 and 30-6 at 8; *see also* Neuroscientists' R&R at 10).

petition which reflected on Schedule I, among other things, six years of employment at IMIC as a "consultant," with minimal income. *Id*. (linking to bankruptcy petition). Dr. Nikolov's wife, Ms. Cabo, was listed as "unemployed." *Id*. In 2014, Ms. Cabo also filed a Chapter 13 bankruptcy petition. *Id*. In her petition, she does not list a spouse on Schedule I, and states that she has been employed as an "independent contractor" at IMIC for four years, making approximately $3,200 per month. *Id*. It does not reference any co-debtor or co-debtor's employment. The QCM Report notes a "sudden change in fortune" for the couple by 2018, and speculates whether it may be related to IMIC's relationship with Cassava. *Id*. at 18-19.

The QCM Report also targets Evelyn Lopez-Brignoni, M.D., Principal Investigator for the simufilam clinical trials and one of the authors of the 2020 *Journal of Prevention of Alzheimer's Disease* paper reporting on the results of the Stage 2b trial. *Id*. at 15; *see also supra* n.8. Ms. Cabo apparently met Dr. Lopez-Brignoni when she was "a court-appointed psychiatrist during a custody trial." *Id*.[9] Most concerning, however, is an FDA Warning Letter (linked in the QCM Report) relating to an FDA clinical site inspection on June 8 and June 23, 2020 which found, *inter alia*, "inadequate dosing" and that "some subjects may have taken placebo only rather than the required study drug," "rais[ing] concerns about the validity and integrity of the data collected at your site." *Id*. (link to March 2, 2021, FDA Warning Letter). The FDA Warning Letter is heavily redacted and QCM notes that the timing "would be consistent" with the simufilam study, but expresses concern that whether or not this relates to the simufilam study, the warning letter "casts doubt on the suitability" of Dr. Lopez-Brignoni and IMIC for the clinical trials. *Id*. at 16.

---

[9] QCM reports that this is "[b]ased on Aimee Cabo's autobiography," which is neither linked nor quoted. *Id*. at n.19.

Another person involved with IMIC, "Juana Peligri" or "Juana Pelegrino," is described by Ms. Cabo and IMIC as a "trained clinical psychologist" and is represented to have a Ph.D., but QCM "found no evidence of a Ph[.]D[.] dissertation or any academic publication that are typically part of a doctorate." *Id*. at 17. QCM also reports that Ms. Pelegri's LinkedIn profile apparently does not mention a Ph.D., nor has QCM found any medical qualifications beyond an expired "Basic X-Ray machine operator" license. *Id*. The QCM Report concludes its exposé on Ms. Pelegri by questioning her role at IMIC, where she "may be in charge of diagnosing [or enrolling] Alzheimer's patients in the [s]imufilam trial, something for which she would lack qualifications." *Id*.

Finally, the QCM Report challenges the protocols at two clinical testing sites, IMIC and OptimusU. *Id*. at 31-34. After briefly recapping the other defendants' concerns with the results from the clinical trials (*see id*. at 22-24; *see also* Neuroscientists' R&R and Dot.Com Defendants' R&R), QCM sought to "probe the patient enrollment process of the [s]imufilam trials," by sending investigators to clinical testing sites who were coached to try to exclude themselves from the trials. (ECF 30-10 at 31). At IMIC, one of QCM's investigators was offered $200 over the phone to bring her elderly father; other investigators were offered participation in the trials despite presumably scoring highly on the cognitive test. *Id*. at 32, n.42. The QCM Report continues with the opinion of a consultant, Andrew Jacobson, M.D., who lists a number of red flags, including the high rate of exclusion of subjects in each of the clinical trial cohorts – 7 out of 22, 8 out of 21, and 10 out of 20 from the placebo, 50mg, and 100mg cohorts, respectively. *Id*. at 34-35.

7

*ii. Social Media Statements*

Plaintiff attaches a 139-page chart purporting to collect statements and comments made on Twitter/X by QCM and the Dot.Com Defendants. (*See* ECF 30-2, Appendix A). The majority of the statements by both QCM and the Dot.Com Defendants reference the Citizen Petition and the Dot.Com reports, and QCM also references results of its own investigation, summarized *supra*. QCM posted several tweets on November 4, 2021, the day that Cassava halted trading before issuing a press release entitled "Review by Journal of Neuroscience Shows No Evidence of Data Manipulation in Technical Paper Foundational to Cassava Sciences' Lead Drug Candidate," which seem to be responding to Cassava's actions on that day. (*See* ECF 30-2 at 7; *see also* ECF 30-18, Exhibit 16 – November 4, 2021 Press Release).[10] Other QCM tweets, presented by Cassava without context, appear to be quasi-conversations or engagement with others. *See, e.g.*, *id*. at 9.[11] Others appear to accuse Cassava or its executives of criminal conduct. *See, e.g.*, *id*. at 23.[12]

---

[10] *See, e.g.*, ECF 30-2 at 7, QCM November 4, 2021 Tweet: "We have read with interest [Cassava's] latest press release. Clearly there is a conflict between the citizen's petition [sic] (which we found credible) and what the [Journal of Neuroscience] declared today. We caution that nothing in that release invalidates our own, well referenced, findings."

[11] For example, QCM's November 6, 2021 Tweet: "This looks damning to us[.]" (ECF 30-2 at 9); November 12, 2021: "What they are doing is astounding and, frankly, desperate. They are making a joke of market abuse rules and of the clinical research process. They must not be allowed to get away with this." *Id*. at 15; November 16, 2021: "The egregious nature of this scheme is clear for all to see[.]" *Id*. at 19; November 17, 2021: "Don't forget a reserve for fines and litigation. There may be hundreds of patients who are sick with Alzheimer['s] disease which could've been treated with something more effective. Some of them, or their families, are going to want blood[.]" *Id*. at 21.

[12] For example, QCM's November 19, 2021 Tweet: "[A Cassava] "Twitter warrior" seems to imply that Lindsay Burns, An [sic] executive of Cassava, regularly feeds him non-public information through the chat "Discord." Lawyers please come forward about the legality of this[.]" *Id*. at 23; November 21, 2021: "Making false statements about a stock, while demonstrably knowing they are wrong and holding that stock, is the very definition of market manipulation[.]" *Id*. at 25.

After November 2021, when QCM published its report, Appendix A lists a few more QCM tweets in 2022 that appear to be reacting to news about Cassava, including articles published in Science, Reuters, and the New York Times reporting on allegations of fraud and manipulation of the scientific results underlying the discovery and development of simufilam.[13]

## III.   ANALYSIS

### A.   Standard of Review

For the purpose of deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept all allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). If the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face," the complaint should not be dismissed. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a claim to sufficiently "raise a right to relief above the speculative level," it must be grounded on factual allegations. *Twombly*, 550 U.S. at 555. A claim grounded on mere suspicion is not enough to meet this standard. *Id*. "'[L]abels and

---

[13] For example, QCM's July 27, 2022 Tweet: "[C]ongratulats [sic] to all the brave people that contributed to this and fought for honesty and transparency in the markets . . . ." This tweet links to a Reuters article titled "Executive: Cassava Sciences faces U.S. criminal probe tied to Alzheimer's drug, sources say." *Id*. at 106, n.24.

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (internal citation omitted, alteration in original).

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citation omitted). However, "the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.* (citations omitted); *Maroney v. Woodstream Corp.*, No. 19-CV-8294 (KMK), 2023 WL 6318226, at *1 (S.D.N.Y. Sept. 28, 2023). The Court can take judicial notice of public disclosures such as those filed with the SEC or FDA. *See, e.g.*, *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 333 F. Supp. 3d 135, 152 (E.D.N.Y. 2018) (taking judicial notice of three citizen petitions to the FDA).

### B. QCM's Statements are Non-Actionable Opinion

Under New York law, a complaint asserting defamation must plausibly allege five elements: "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). When a defamation claim

is brought by a public figure,[14] the First Amendment independently requires a showing that the defendant acted with actual malice. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 283 (1964).

The QCM Report clearly identified QCM as a hedge fund engaged in short-selling, and was replete with disclaimers and cautionary language throughout. (*See* ECF 30-10 at 3). QCM's opinions were clearly described as such, and such market analyst reports and investment analysis are generally considered non-actionable opinion. *See, e.g.*, *MiMedx Group, Inc. v. Sparrow Fund Management LP*, No. 17-CV-7568 (PGG) (KHP), 2018 WL 847014, at *7 (collecting cases); *see Cummins v. SunTrust Capital Markets, Inc.*, 416 Fed. Appx. 101, 103-104 (2d Cir. 2011) (characterization of option grants as "self-interested, abusive, unethical, unjustifiable, a manipulation of securities regulations, and akin to backdating were non-actionable . . . While [Plaintiff] quarrels with the negative implications of these characterizations, such implications do not transform the characterizations from expressions of opinion into statements of fact.") (citations omitted). This alone should be sufficient for dismissal of the defamation claim arising from statements in the QCM Report, but I will further address why each of the different categories of statements are not defamatory.

### i. The Science-Based Statements Are Not Defamatory

As discussed at length in the Neuroscientists' and Dot.Com Defendants' R&Rs, statements made by QCM commenting on, discussing, reporting, or opining on the Citizen Petition and FDA Letters, and the Dot.Com Defendants' presentations or letters to the FDA, do not give rise to a defamation claim. As discussed previously, these statements rely on Cassava's

---

[14] Cassava does not deny that it is a public figure. (*See* ECF 81 at 5, 9: "Cassava does not and cannot deny that it is a public company that made public filings in pursuit of a drug it hopes to test on and sell to the public.").

11

own public statements and data, and results published by Cassava's scientists, and the Neuroscientist and Dot.Com Defendants have "shown their work" in explaining why they drew the inferences they did. That some of these journals have since issued errata or full retractions is, at best, immaterial.[15]

> ii. *Statements about Clinical Trials and Cassava and IMIC Personnel Are Factually True or Non-Actionable Opinion*

QCM's statements about Cassava and IMIC personnel are also not actionable because they are not defamatory. Cassava does not claim that any of the specific factual statements about Cassava personnel (such as prior criminal history or prior lawsuits) are false; these statements appear to be drawn from publicly available information. Similarly, the statements about Dr. Nikolov, Ms. Cabo, and Ms. Pelegri are not alleged to be false; indeed, the QCM Report may have led to a correction to Ms. Pelegri's credentials,[16] and at least some of Ms. Cabo's personal history appears to be drawn from her own statements, made in an autobiography and a video.[17]

The conduct of IMIC personnel in connection with the recruitment of QCM's investigators is also not alleged to be false. QCM references that conduct, together with the publicly available, apparently factual statements about key personnel at Cassava and IMIC, and publicly available information about Cassava's bonus structure, to draw inferences that Cassava

---

[15] The Court has not relied on the substance of any errata or retractions and does not take a position on the "truth" of the scientific opinions and hypotheses. But this continued discourse *among scientists* supports this Court's view, stated previously, that concerns about scientific research integrity do not belong, in the first instance, in the courts. *See* Neuroscientists' R&R at 21.
[16] ECF 30-2 at 53 (January 17, 2022 QCM Tweet states: "IMIC just changed the description of Juana Pelegri from PhD to "candidate". Indirectly confirming that the previous description was a lie, as we highlighted in our report.").
[17] ECF 30-10 at 14, n.14.

may believe are highly unflattering, but they are not defamatory statements of fact. *See, e.g.*, *Cummins*, 416 Fed. App'x. at 103 ("[D]efendants' critiques of the option grants, as well as their doubts regarding the credibility of Cyberonics' management and predications about possible regulatory action, constitute subjective, non-verifiable opinions."). In Cassava's own briefing, Cassava writes that the various critical (but unchallenged) assertions about Cassava and IMIC personnel would lead a "reasonable reader" to conclude that "Cassava is a fraud." (ECF 88 at 16). In other words, even Cassava admits that any negative conclusion about Cassava is a broad inference that could be drawn by a reasonable reader from truthful statements[18] in the QCM Report. *Milkovich v. Lorain Journal*, 497 U.S. 1, 11–14 (1990); *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153–54 (N.Y. 1993).

### iii. *The Social Media Statements Are Not Actionable*

Cassava's defamation claims against QCM also reference statements made by QCM on Twitter, which are identified in Appendix A to Cassava's FAC. (ECF 30-2). Many of the statements are presented without context and are either factual or make no reference to Cassava at all (e.g., an April 26, 2022, Tweet stating: "As the saying goes: "rats" leaving the sinking ship?"). *Id*. at 88. Still others refer to and comment on events happening in real time (e.g., a November 4, 2021, Tweet stating: "We have read with interest [Cassava's] latest press release. Clearly there is a conflict between the citizen's petition [sic] (which we found credible) and what the journal declared today. We caution that nothing in that release invalidates our own, well referenced

---

[18] Moreover, the allegedly false "facts" Cassava cites in its opposition brief (ECF 88) at 25-26 are either substantially true or are inferences drawn from publicly available information.

findings[.]") *Id*. at 7. These statements are not actionable: they are opinions, and Cassava disagrees with their content.

Even the most critical tweets, which suggest market manipulation but are not obviously linked to Cassava,[19] are not actionable. "[E]ven accusations of criminal behavior are not actionable if, understood in context, they are opinion rather than fact." *Hayashi v. Ozawa*, No. 17-CV-2558 (AJN), 2019 WL 1409389, at *2–5 (S.D.N.Y. Mar. 28, 2019) (collecting cases) (noting that blog posts with a "hyperbolic and rhetorical tone" claiming a doctor of podiatry was not a doctor were protected statements of pure opinion). QCM's rhetorical and hyperbolic statements – some of which include monkey emoji — on a social media platform its owner claims to function as a "common digital town square, where a wide range of beliefs can be debated in a healthy manner"[20] would be understood by an ordinary reader as pure opinion, whether or not the platform in fact functions that way. *Hayashi*, 2019 WL 2409389, at *5; *see Ganske v. Mensch*, No. 19-CV-6943 (RA), 480 F. Supp. 3d 542, 552-53 (S.D.N.Y. Aug. 20, 2020) (finding tweets on Twitter/X were opinion and not actionable as defamation; Twitter/X is a forum "equally – if not more – informal and freewheeling" than many other internet fora, and statements published on Twitter/X were "generally informal and unedited" and given less credence by readers) (internal quotations omitted). Read together with the QCM Report, which

---

[19] In tweets that did not mention Cassava or link to Cassava, but are quoted with no context, QCM has used the following phrases: "shameless market shenanigans" (ECF 30-2 at 56, January 20, 2022), "desperate pumping attempt" *id*. at 61 (February 11, 2022), "Cassava fraud and Alzheimer's capitalism" *id*. at 39 (December 15, 2021); "Making false statements about a stock, while demonstrably knowing that they are wrong and holding that stock, is the very definition of market manipulation[.]" *id*. at 25 (November 21, 2021).
[20] *See* Elon Musk, October 27, 2022 Tweet, https://twitter.com/elonmusk/status/1585619322239561728/photo/1.

14

is full of disclaimers and caution, it is clear that these tweets, if directed at Cassava, constitute QCM's investment analysis and criticism. *See, e.g.*, *MiMedx Group, Inc.*, 2018 WL 847014, at *7.

### C. The FAC Fails to Plead Malice and Causation

The FAC also fails to plead facts supporting actual malice and causation for the same reasons I articulated in the Neuroscientist Defendants' R&R. (*See* Neuroscientists' R&R at n.28). Cassava's assertions of malice and causation against QCM, however, bear slightly more analysis. Cassava makes the circular argument that because QCM's statements[21] are "false," QCM must have "entertained serious doubts as to the truth of their publication." (ECF 88 at 26-27) (cleaned up). To bolster their argument, Cassava suggests that a disclosed short position[22] is circumstantial evidence of improper motive. *Id*. at 27. And finally, Cassava asserts, in conclusory fashion, that "no evidence" exists for the inferences that were drawn by QCM and the Dot.Com and Neuroscientist Defendants before them, notwithstanding the cited and sourced reports and letters to the FDA that form the basis of the defamation claims in this case. Repetition does not, however, convert a bald-faced conclusion to truth.

Finally, Cassava has not – and could not – plead causation. Indeed, in the days following the publication of the QCM Report, Cassava's stock price actually increased. (ECF 78 at 30).

---

[21] The Court has reviewed ECF 88-1 (Appendix A – Cassava's Allegations of Falsity & Actual Malice as to QCM's Defamatory Statements), a 59-page chart of QCM's allegedly defamatory statements, paired with citations to the FAC where Plaintiff alleges that they have pleaded falsity and allegations of actual malice. Even taken out of context, the statements are plainly opinion, many beginning with "[w]e believe," and characterizing certain facts or events as "worrying," "unclear," "astounding," "alleged," "surprisingly," and "[t]his looks damning to us." *Id*.
[22] More concerning, Cassava's "Conclusion" section begins with the statement, "Short sellers are now being investigated by the DOJ for their nefarious exploitation of the stock market and seeking to get rich by publishing disinformation[,]" and that a defamation lawsuit is the only recourse for Cassava "[w]hile waiting for the DOJ and others to act." (ECF 88 at 32). QCM does not appear to be one of the short sellers being investigated, and this assertion suggests that Cassava's lawsuit was instituted to stifle criticism by short sellers.

Cassava has also not tied any of QCM's social media statements (even if they were actionable) to any change in Cassava's stock price or any other injury. Again, conclusory assertions of harm because of Cassava's dislike of criticism are not sufficient to lead to a plausible inference of causation. Public markets operate most efficiently when there is a free exchange of information, and courts have repeatedly found that reports and opinions concerning the stock market and publicly traded securities are non-actionable opinion. *See, e.g.*, *MiMedx Group, Inc.*, 2018 WL 847014, at *7 (collecting cases).

## IV. CONCLUSION

Because I find that the statements are statements of opinion, specifically, inferences drawn from facts and data presented by Cassava or otherwise publicly available, they are not actionable. I respectfully recommend that QCM's motion to dismiss be **GRANTED**.

## V. OBJECTIONS

In accordance with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* FED. R. CIV. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to the Honorable Gregory H. Woods, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Woods.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS <u>WILL</u> RESULT IN A WAIVER OF OBJECTIONS AND <u>WILL</u> PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140,

155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir. 1983).

Respectfully submitted,

 _/s/  Ona T. Wang_

Dated: January 23, 2024 **Ona T. Wang**
New York, New York United States Magistrate Judge

17